JASON SAVAGE, et. al., Plaintiff,
v.
GOVERNMENT OF AMERICAN SAMOA, et. al., Defendants.

High Court of American Samoa
Trial Division

CA No. 83-82

June 7, 1983

GARDNER, Chief Justice.

Jason Savage, age 5, a resident of the public housing enclave at Tafuna, was attacked and severely bitten by a stray dog bearing the improbable name of Tweeter. Through his guardian ad litem he seeks damages from the Government of American Samoa for his injuries. Before discussing the facts of this case or the applicable law, we must paint, in broad strokes, a background of the canine situation in this territory and particularly in the Tafuna Governmental Housing tract.

### THE DOGS OF AMERICAN SAMOA

There are few places on this earth which suffer more than American Samoa from an oversupply of man's so-called friend, the dog. Untold thousands of dogs roam the territory. Some are strays, some have a vague claim to ownership by a human being, a tiny fraction are actually licensed and registered. Almost without exception they are mongrels--scrawny, emaciated, mangy, in-bred, flea-bitten, diseased. Sophisticated world

travellers usually refer to the dogs of Mexico and China as the worst looking dogs in the world. Compared to the dogs of American Samoa, the dogs of Mexico and China could qualify as best of their class at Madison Square Garden.

The territory has no leash law. It has a singularly ineffective and widely ignored license law (sections 25.1607 & 27.0243 ASCA) and a peculiar stray dog control law (section 25.0301, *et seq.*, American Samoa Administraive Code) of which more later. As a result, large numbers of dogs, usually in groups or packs, roam the territory at will, fighting, frolicking, fornicating, barking, snarling, and during a full moon, howling either in unison or singly. All of this, standing by itself, is a nuisance. However, a more ominous result of this bulging canine population is an awesome number of attacks by dogs on human beings, usually small children. For example, during the fiscal year 1982, 215 dog bites were recorded at the LBJ Tropical Medical Center. Such a number of bites is shocking considering that the territory only has a polulation of 32,000. That is almost one dog bite for every 150 people. Obviously this statistic is but a tip of the iceberg as only severe bites would ordinarily require medical attention.[1]

In other words, the dog situation in American Samoa is a disgrace.

## THE STRAY DOG ERADICATION AND CONTROL COMMISSION

The Governmental answer to the over-abundance of dogs in the stray dog eradication and control commission. This commission consists of a steering committee which in turn consists of the Secretary of Samoan Affairs, the three District Governors, the Commission of Public Safety, the Director of Public Health and the Veterinarian, plus the County Chiefs of each county, the Pulenu'u of each village, two public health employees, and two police officers.[2]

Through no fault of the court the record in this case is a little hazy as to the activities of this commission. When a subpoena duces tecum was served on the custodian of records, Office of Samoan Affairs, for records of dog bites, her superior advised her to disobey the subpoena. It was only after the court dispatched the marshal with instructions to bring the custodian to court, in custody or otherwise, that she did appear. A similar subpoena to the custodian of records, Department of Public Safety, for their records of dog bites was equally unproductive. That individual reported he was "on leave" the day of the trial. One cannot but be suspicious of the curtain of silence cast by these two governmental agencies over the subject of dog bites. (Apparently, dog bites are a touchy subject with the Secretary of Samoan Affairs and the Department of Public Safety.) Nevertheless, Malua Hunkin, Acting Commissioner of the Department of Public Safety, did graciously and voluntarily come to court and testify although he knew nothing of the department's records in this respect. It is from his testimony and that of the lady from the Office of Samoan Affairs that a rough, inadequate, and sketchy picture of the dog control situation in American Samoa can be patched together.

------------------------

1. T'was not always thus. During the Naval Administration a dog license law was strictly enforced and any dog without a collar was quickly disposed of by the Fita Fita guard.

2. With an organization of this size it seems that one could simply arm the members of the commission with nets, send them out to round up stray dogs and clean up this mess in a couple of days.

When a dog bite is reported, police officers interview the victim, prepare a report, and forward it to the Department of Samoan Affairs. That completes the responsibility of the police. The Department of Samoan Affairs apparently then forwards the report to the Pulenu'u of the village where the attack took place. From that time on the responsibility is that of the village. Some villages are apparently quite active and a goodly number of stray dogs are disposed of each month. However, all one has to do is travel around the territory to observe that other villages are doing precious little about their stray dog problem. If the commissin does any more than set forth above, the court was unable to discover that fact by reason of the veil of secrecy on the subject by the two departments.[3]

## THE DOGS OF TAFUNA

Whatever the effectiveness of the commission may be as to individual villages it affords no protection to the inhabitants of the public housing enclave at Tafuna which is not a part of any village. Insofar as the inhabitants of Tafuna are concerned, dog bite reports simply become useless pieces of paper reposing in the respective offices of the Department of Public Safety and the Department of Samoan Affairs. Nothing is done.

As a direct result of this complete lack of animal control, Tafuna is simply saturated with stray dogs. Tafuna's dog count must be mind boggling although no effective canine census exists. They travel singly or in packs as large as eight to ten. It is with this background we examine the attack on Jason by Tweeter.

## JASON AND TWEETER

Jason's father is a contract employee of the American Samoa Government. As part of his contract the American Samoa Government provides him housing in the Tafuna public housing tract for which he pays rent.

Directly adjacent to the American Samoa Government housing tract and separated by an invisible line is the F.A.A. Housing tract. Geographically the two contiguous tracts are one.

Tweeter was a stray dog inhabiting the A.S.G./F.A.A. Governmental housing enclaves. In November 1981 Tweeter attacked and severely mauled the small child of Lieutenant Mike Morris, U.S.C.G., who was living in the Tafuna F.A.A. tract. The police were called and made a written report to the Department of Samoan Affairs. That, apparently, was the extent of official reaction to this attack on a small child by this particular stray dog.

Then, approximately three months later, Tweeter atacked Jason Savage, bitting him severely in the head, ear, and hand. Again a report was made but nothing was done by officialdom. Instead, frustratd with official inactivity, a vigilante spirit prevailed and some unidentified person prevailed upon a couple of Tongans to beat Tweeter to death with clubs. It wasn't pretty and the S.P.C.A. would undoubtedly have disapproved but it was effective. So much for Tweeter.

---

3. Apparently, there was a suggestion some time ago that dog control be vested in the police department as is the usual practice in most other similar communities. However, the administration did not see fit to implement that suggestion.

# THE LIABILITY OF THE GOVERNMENT OF AMERICAN SAMOA

There are two aceptable legal theories on which the Government of American Samoa is liable in tort for Jason's injuries. It is liable both in its governmental and its proprietary capacity.

## GOVERNMENTAL CAPACITY

Ordinarily a governmental entity is not liable for its torts if they are committed in its governmental capacity. This is because of the Doctrine of Sovereign Immunity, a doctrine Prosser calls "feudal and monarchist." Prosser is puzzled as to just how "the doctrine got itself translated into the law of the new and belligerently democratic Republic in America." (Prosser, the Law Torts, 4th-Edition, p. 971.) Nevertheless, in 1821, Chief Justice John Marshal adopted the Doctrine of Sovereign Immunity as the law of the land. (Cohens v. Virginia, 19 U.S. 264.)

Be that as it may, the doctrine exists in one form or another in every American Jurisdiction.

ASCA section 43.1203(a) purports to abandon the doctrine in this Territory. Then subdivision (b) of the same section reinstates it in all its glory, particularly subdivision (b)(2) which provides for governmental immunity in maters depending on the exercise of a discretionary function. That covers a great deal of territory. Thus, generally speaking, at first blush it would appear that whether the Government has an effective stray dog control program depends on the exercise of a discretionary function and the government is protected by the Doctrine of Sovereign Immunity. Not so in this particular case.

Since there is no local controlling authority we turn to other jurisdictions for guidance. While these authorities are not controlling, they may be persuasive. Fortunately, in out research we have stumbled on a most persuasive authority, the elusive "spotted calf" case. Under it and under the facts of this case, the Government loses its cloak of immunity.

In Hansen v. City of St.Paul 214, NW(2) 346 (Supreme Court of Minnesota) the facts were striklingly similar. In Hanson there were two vicious dogs which had accumulated seven reports prior to their attack upon a woman but the principle is the same. The court held that the City had a duty to maintain its streets and sidewalks free from the inherently dangerous condition created by known vicious dogs. Additionally, Minnesota had a similar discretionary function exemption from liability. The court made short shrift of this contention holding that the failure of the city to act in the face of a known dangerous condition occurred at the operational level rather than at the executive or administrative level (the deployment of personnel). "We hold that the failure of the St. Paul City officials to control vicious dogs under circumstances wherein the city had knowledge that identified and impoundable vicious dogs prowled uncontrolled on public sidewalks does not constitute a failure to exercise a discretionary function within the meaning of Minnesota St. 466.03, Subd.6, and therefore the City of St. Paul is not immune from liability." (p. 350-351.)

Here, the Government of American Samoa had knowledge that a vicious dog was prowling its streets. This created an inherently dangerous condition. The failure of the Government to act constitutes a failure at the operational rather than the executive or administrative level. Therefore, the Government of American Samoa is liable in this case while acting in its governmental capacity.

## PROPRIETARY CAPACITY

When the Government acts in a proprietary capacity it loses its

sovereign immunity. (Owen v. City of Independence, 445 U.S. 622, 63 L.Ed.(2) 673.) Attempting to define just what is governmental and what is proprietary has resulted in an plethora of cases which, again in the language of Prosser, "has left this law in a tangle of disagreement and confusion." (Prosser, Supra, p. 977.) One court, in Weeks v. City of Newark, 62 NJ super. 166, 162 A(2) 314, affirmed, 34 NJ 250, 168 A(2) 11, complained that the rules which the courts have sought to establish in solving this problem are as "logical as those governing French irregular verbs."

It is generally accepted that an act or ommission is governmental if it is in the public good and beneficial to the citizenary at large. Contrarily, the act or ommission is said to be proprietary if it is of benefit to a private or local interest group (63 C.J.S. 747).

Thus, the operation of a municipal golf course was held to be proprietary in Plaza v. City of San Mateo, 266 P(2) 523 (Cal. 1954), as was the collection of trash for a fee in Baumgardner v. Boston, 23 NE(2) 121 (Mass. 1939) and a housing authority created by state statute for slum clearance and to provide housing in Muses v. Housing Authority, 189 P(2) 305 (Cal. 1948.)

Here the Government of American Samoa owns the real property and rents it to its contract employes. This is part of the contract of employment. Tafuna is similar to company town. The employees live in the community for the convenience of the employer. The employees cannot move away as their housing has been assigned to them and no other housing is available. They cannot leave the territory without breaching their contracts of employment. There is not only a landlord-tenant relationship, the employees are virtually captives of the government.

Thus, it is obvious that a landlord-tenant relationship exists between the occupants of the Tafuna Governmental Housing tract and the Government of American Samoa. In this respect the Government of American Samoa is clearly acting in a proprietary capacity.

The landlord owes a duty of care toward his tenant (See below). Was that duty breached? Yes.

The landlord/government knew that there was a serious territory wide problem with stray dogs. It is common knowledge shared by the government/landlord that the entire territory is over-populated with dogs. As a result of this the landlord/government knew that the inhabitants of the territory were sufering from a veritable plague of dog bites --215 reported to the hospital in one year. Insofar as the Tafuna Governmental Housing tract is concerned, the landlord/government knew not only that there was a surplus of stray dogs but that by reason of it stray dog control program absolutely nothing was being done about this oversupply of stray dogs in the Tafuna Housing tract.

Then, addressing ourselves to this specific case, the landlord/government knew that this one dog had attacked and seriusly injured a small child. That dog obviously had violent and vicious propensities and became a known danger. The landlord/government knew that nothing was done about that dog. Thus, it was reasonably forseeable that particular dog would bite another child. It did.

The duty of a landlord is clear and has been distilled into a few words by California Jury instructions - Civil - Sixth Edition, as follows:

> He has the duty to exercise ordinary care in the
> management of the premises in order to avoid
> exposing persons thereon to an unreasonable risk
> of harm. A failure to fulfill this duty is negligence.

106

Ordinary care is that care which persons of ordinary
prudence world use in order to avoid injury to themselves
on others.  This duty of care is owed only to such persons
as the owner, as a reasonably prudent person under the same
or similar circumstances, should have forseen would be
exposed to such a risk of harm.  Thus the landlord is
liable for injuries resulting from dangerous conditions
of which he has knowledge.

Applying these rules to the facts of this case it is manifest that  the
Government of American Samoa is liable in its proprietary capacity.

## DAMAGES

Having  found liability on two grounds,  the remaining issue is one  of
the  damages.   The child suffered serious injuries with resulting  scarring
and psychic trauma.  The court fixes his damages in the sum of $10,000.00.

## CONCLUSION

From  the record in this case,  it is clear that the inhabitants of the
A.S.G./F.A.A.  Governmental  Housing tracts in Tafuna are  entirely  without
protection against the packs of stray dogs presently infesting those areas.

Additionally,  it  is  a  sad commentary that under  the  authoritarian
administration  of the Navy the dog situation in this territory was that  of
any  other American community -- only licensed dogs allowed  -- while  under
self rule the stray dog plight has become a territorial embarrassment.   The
responsibility  lies squarely on the shoulders of the Government of American
Samoa.